May it please the Court, good morning. I'm Katherine Felton representing Appellant Federal Resources Corporation. I'd like to reserve five minutes for rebuttal. We're here on three issues this morning arising from the District Court's grant of summary judgment in favor of the United States in this circle action. I'd like to use my time this morning to focus on the arranger liability and the divisibility and apportionment arguments and as time permits so the Court has questions to address NCP compliance issues. Turning to the issue of arranger liability, the District Court granted summary judgment on the basis that there was no question of material fact as to the United States' intent as to the disposal of hazardous substances when it entered into a DMEA mining contract with the funnel and major mining company in the early 1950s at the Conjecture Mine site. Arranger liability under CERCLA as this Court knows, extends to any party who by contract, agreement or otherwise arranged for disposal of hazardous substances owned or possessed by that person or by any other party or entity at the facility. A disposal includes depositing, dumping, spilling or placement of any hazardous substance or solid waste onto the land or into the water such that it can be exposed to the environment. Solid waste is defined to specifically include discarded material, whether it's solid, liquid or gaseous, resulting from various operations including mining operations. As we know from Burlington Northern, the Supreme Court decision in 2009, the focus on whether a party arranged for the disposal of a hazardous substance focuses on the intent that the party had at the time that it entered into the transaction, whatever the nature of that transaction may be. So the District Court was well aware of that standard? It was. And where did it go wrong in concluding that there were no tribal issues of fact that the government intended? It summarily dismissed historical documents that detailed the government's analysis and exploration contract with Funnel and Major. The documents recorded that the DMEA officials looking at the property wanted the operation and construction of a mill at that site for the greater purpose of stimulating mining in the region. So how does that relate to disposal or removal or? Sure. The government had conducted an analysis earlier of the region in the 1940s as to whether it was feasible to generate or stimulate mining in that area. It is extremely remote and the ability to extract ore and simply ship it somewhere else to be milled is impossible. It wasn't feasible economically and it wasn't feasible given weather conditions and the geographical nature of the property or the location. Does that show the government's intent on entering into a contract for disposal? So it is a large piece of the historical record about why the government took the actions that it did. It is not the only piece of evidence. What happens after the government determines that it wants to enter into this deal with miners or with two gentlemen who had no mining experience, which the experts both acknowledge is unusual, both the government's experts and our experts. DMEA typically looked for the ore that they had been given, which did not look like it would be successful and did not seek out the metals that were of strategic significance to the United States. It changed it significantly so that the exploration would go at depth and look for zinc and lead, which the government did want to find, as opposed to silver and the shallow workings. So what we have is the government deciding that it's interested in having a mill. It takes and develops a plan, which it then gives back to Funnel and Major and says, here's the proposal that we'll sign on to. Funnel and Major, having no mining experience and wanting money to do this project, accepted it. And the government even funds it, right? Fifty-fifty. Fifty-fifty. Avsies all the way. Yes.  Okay. So intent, that's the crux of the issue. Intent can be direct evidence or inferred from the totality of the circumstances. Sellofoil, which was a case which was cited, relied on as a foundational case for the Supreme Court's announcement of the Burlington Northern Standard, was a case where you had customers of buying virgin solvent from a manufacturer. That manufacturer also ran a drum rebate return program. So you could buy your drums of solvent, you could return it, and you'd get a rebate. Well, the contract with the customers was for the sale of virgin solvent, but it had this separate program. And the court in Sellofoil, it was a Sixth Circuit case from 1996, found that summary judgment in that case wasn't appropriate. It adopted an intent standard, and it says from the totality of the circumstances here, we could infer, or at least it's for a jury or a tribal issue of fact, as to whether there was intent for the customers buying the product to also dispose of the residues in the drum when it returned the drums as part of this program. Would the government's indifference be any proof of intent? Indifference is a conclusion. It's not a fact. Unless, I suppose, you had a historical record that says we're indifferent, which, you know, the nature of historical records at any industrial site or operation is... Well, didn't the government pretty much leave the operation to K&M or whoever was running the place? To F&M. F&M? No, it was regularly out there. The government wasn't running the show. No, but that gets to the question of control over the operations, which is more of the operator's standard of liability. It's not the arranger's standard of liability under CERCLA. So inherently, an arranger is someone who isn't in the midst of day-to-day operations controlling, managing the disposal, generation, treatment of hazardous substances. The United States here, actually, though, did have significant involvement in the operations. It went out monthly. It made reports on what was happening. It made directional changes to where the miners were mining the ore so that they would be more successful and more likely to find a vein. They were mining in the wrong direction. The government also – excuse me, I lost my train of thought. Well, let me ask you. So you point – you pointed to the – where the district court went wrong is they didn't – the district court didn't give adequate consideration to the historical records. What else? It relied on the Shell 2002 determination that control is the crucial element in arranger liability. And after Burlington Northern, it's not control. It's the overall intent. Now, control can be a factor or a fact, a part of the factual analysis, just as ownership can. And the court here also ignored, or at least didn't spend any analysis on, the fact that the government, in entering this contract, was stepping into private property because this was a private – on private property. Right. And it was acquiring rights and claims to the mineral deposits that would be found because of the exploration project. And those rights stayed beyond termination or survived any termination of the agreement that would happen, either because the work was completed or because the government unilaterally terminated it. So is your argument that these historical records show that the government was involved – in fact, even helped 50-50 on the development of the mining site and the milling and whatnot? They well knew what was going on. They monitored it. And therefore, if you look at the historical record, one could infer that they intended to arrange for the disposal as well as the development of the site, of the mine? Yes. That's what you want – that's what you say is the factual dispute? Yes. The construction and operation of the mine is the reason they enter the transaction in the first place. Now, they couldn't just go out and pay to build a mill. What they wanted was the mill. But what they could do was fund exploration work with F&M. And they did continue to pursue F&M building the mill after they had signed the contract. So they had a follow-up – at least one follow-up conversation where they said, your mine needs a mill or it won't be profitable. And then they followed the timeline and monitored it. And it was built. And then it was available for production when the ore was discovered. And there was a discovery. So it's the totality of the circumstances that they – what they wanted was ultimately to succeed in finding ore, to have the mill there to process it. And also, by achieving that goal, what you get is other regional mining operations might be stimulated to explore more or to find ore bodies that could be developed and extracted locally because you then had a mill on site to make it economical. And therefore they – and therefore they what? As a result of all of that, how does that get to a ranger? The standard of practice at the time was to deposit mill tailings on site. It goes to the historical practice of mining. The government knew that the ore wasn't going to be trucked, and neither were the tailings. It had to be processed there. Inherent in the processing of ore there is the production of tailings. The government also was interested in where were those tailings going because it wanted to know if it could be reprocessed for more metals later. And, in fact, what we see is there are a number of inspections locating on a form are there stockpiles or piles of tailings capable of reprocessing later. The government would get royalties, additional monies for ores that it had – or metals that it had rights in in those tailings if they were reprocessed. Council, I don't want to interrupt your argument if you want to keep going, but earlier you said you wanted to reserve five minutes for – Why don't I go ahead and reserve unless the Court has more questions for me right now? And I don't think you touched much on – Divisibility. Divisibility, right, so that – So you can decide if you're going to cover that later. I will. Thank you, Judge Gould. Thank you very much, Ms. Fulton. Okay, now for the appellee, United States, we have Mr. Lane McFadden. Good morning, Your Honor. Good, thank you. And may it please the Court, I'm here on behalf of the United States, including the Environmental Protection Agency and the U.S. Forest Service. I'll address ranger liability first since that seems to be the topic of the day. The District Court correctly viewed the historical evidence and found that the United States had taken no intentional steps to arrange for the disposal of hazardous waste at the site. Couldn't one infer that they did by all their little activity out there at the site? No, Your Honor, not on this record. Why not? There's a number of things to look at. First, I would start with the contract between the Defense Minerals Exploration Administration and Funnel and Mayer. That's at ER 1813. It's very explicit that all operations at that mining site are under the sole control of the mining operator and limits the United States' involvement to advice and inspection. There are a number of anecdotes. Well, I mean, that's pretty good advice. I mean, it's pretty significant advice, right? Well, the advice that was actually given had to do with there are two instances pointed out by federal resources. One is where they ought to hang the fire extinguishers, which the mining operator listened to. And one was which direction to drill the mine shaft, which the operator ignored and actually did not follow, which goes to, I think, control of the United States. But there was much discussion this morning of the mill. And if you look at the contract, it's quite clear that the government's contribution of $26,000 was exclusively for the exploration project, the drilling of the shaft, and the search for profitable minerals. None of the United States' money went towards construction or operation of the mill. None of the United States' involvement with Funnel and Mayer had to do with their operation of the mill. It is correct, as the record suggests, that the United States knew there would be a mill there and that it would make the overall site more profitable and more useful. And there's no dispute to that. But again, we go back to Burlington Northern, that knowledge alone is not sufficient. We have clearly established in this record the United States knew there would be a mill. We could infer, if we were to take the facts in the light most favorable to the moving party, in this instance, that the United States knew that tailings would result from the mill and they'd probably be left on site. I would point the Court to the United States inspection reports of the site. You can see one at ER-792 and then a follow-up at ER-799. This is the government's agent evaluating what's going on at the site at the time to make sure that the United States is going to recover its royalties. It does mention, as Council for Federal Resources highlighted, the fact of whether or not tailings were being stockpiled on the site. But critically, what it says, I'm reading from ER-792, is, does the operator stockpile mine or mill rejects, such as tailings, that may have potential value within the royalty payment period? Answer, no. What evidence we have about the government's intention towards these tailings, towards the waste that was being disposed of at the site, is that the government viewed it as valueless. And there is no other evidence in the record whatsoever as to the government's interest in this material, certainly no evidence that the government wanted to reprocess it or try to recover royalties from it. The royalties to which the United States were entitled came from the drilling of the shaft, the minerals that came out of it and that were shipped off to the smelter. That was what the United States' interest was. When did the government's interest in the mine end? It concluded, this contract with Funnel and Meyer lasted four years, I want to say it was 1952 to 1956, at which point, Federal Resources came in and leased the entire site and began its operations. And the United States was never involved in the operations of Federal Resources at the site. So Federal Resources came in, deepened that shaft that Funnel and Meyer started and then drilled shaft number two, which is at the north side, which ended up being the bigger one. They operated there for eight years and deposited most of the waste rock, which is what led us to the need for a response action today. So the United States' interest and their involvement with Funnel and Meyer was really limited to contributing 50% of the funds for the initial cost of drilling that shaft. They never gave any instructions about where to dispose of the waste or how. The United States never expressed any interest in how or where the waste was disposed of by Funnel and Meyer. And what little evidence we have from the government's inspection report suggests that there was no possibility that there was any benefit to the United States that could have come from the way that the tailings were being disposed of in a pond at the site. We'll talk a little bit about divisibility because obviously your opponent is going to come back on that. Yes. All right. Well, then I'll lead off the divisibility discussion. It's important to note at the outset that the Supreme Court's opinion in Burlington and Northern places the burden of establishing a specific theory of divisibility and evidence as to how the record would lead one to a reasonable theory of divisibility on federal resources. And the district court here correctly concluded that it had not been given either a theory or a reasonable basis for applying a theory of divisibility to apportioned harm. You have a site where the... Isn't that a fact-intensive issue? It is. It is a fact-intensive issue. Once you have met the first step of the two-stage process where you have proposed a reasonable theory of divisibility, the district court I think correctly found that it didn't even have that. The facts that were presented as to divisibility all go to how much waste rock each of the different operators deposited. And they say, well, we can calculate how much waste rock we contributed, so that ought to be what percentage of the harm at the site for which we are liable. And as we've discussed extensively in our brief, that doesn't actually give you a theory of divisibility because the harm isn't the rock itself, it's the hazardous metals listed in CERCLA that are contained in the rock. And their experts explained correctly that that varies widely from place to place. Where you found it most was at the top of that huge pile of material at the north dump, the top two feet of that 34-and-a-half-foot pile. The observations in the site investigation and the follow-up documents, the engineering evaluation, the cost analysis, the Forest Service's own action memorandum repeatedly indicate this was the real one concern on the north half on the Forest Service's land. It was exposed to weather, as explained in the excerpts. It's the material that's on top of that pile is the material that was at the bottom of the shaft. It was the deepest because, of course, you're drilling down looking for more mineralized rock that could turn out to be more profitable. That's what gets left on top. It's exposed to wind and rain for 40-some years. The creek flows through it and erodes it. All of this contributed to the contamination that was found at the site. So could you please answer a question to help me on perspective on the circular statutory scheme relating to divisibility? Assuming that the appellant doesn't show divisibility sufficient enough to get an exit from the liability here, do they also have a right to sue some prior other mining company that they think contributed to this to get reimbursement contribution? Yes, Your Honor. They do. They can sue another potentially responsible party for contribution. That is what the counterclaim on arranger liability was. They sued us for contribution alleging the United States was partially liable. But there are other entities involved in this case. There is the Campburn, Colorado operation. There is Mr. Blum and his real estate trust. These were all held to be potentially responsible parties by the district court. They do have that option, Your Honor. Do they still have that option to sue these other entities even if the amount is not divisible? A suit for contribution allows the court to make an equitable allocation between the potentially responsible parties and works differently than a portion of harm finding. There are different components of the statutory scheme. Do the experts determine it was not feasible to determine the percentage of contamination by the metals in the amount of tailings or whatever came out of the mines? That's one of the problems. I want to clear up something. There's a lot of suggestion that the real concern was tailings and they didn't have a mill. If you look at the site samples listed at ER 1557, there's a table of samples taken and a column that says was it tailings or waste rock? The samples of concern were  rock. Waste rock is the source of the contaminants. Was it possible to take samples of the waste rock and figure out the percentage of the  in the waste rock? If you look at the cases where the courts have found visibility, you're talking about a pollutant that's in a consistent solution. In the Fifth Circuit case you have cattle presumed to be the same. The harm itself is homogenous. You figure out how much did each party release. Here they released rock that may have contained very high percentage      the pollutant that was in the waste rock. The evidence is simply lacking and hasn't been put forth. The district court correctly denied their motion for summary judgment on that claim. Are you saying in a contribution claim under a different part of the statute they wouldn't have to show the same level of proof as with divisibility because it's equitable? I don't want to say that. I don't want to mislead the court. We don't find sufficient evidence for divisibility and there are different statutory components to the contribution scheme. I don't want to answer that  certainty. I think that's fair. Thank you. Unless the court has questions about the consistency with the national statistics . But a couple of things that were not mentioned in the case . I don't want to say that the court wouldn't have to show the same level of clarity . There's no allegation that failure to consider all of them is itself a per se violation of the regulations. The regulations do not require that each of those eight factors justify a response. They say here are the eight factors that an agency should consider when considering a response action. And the record reflects that they were considered. Some of them don't apply. One has to do with whether there are barrels of waste  site. But five of them were explicitly addressed in the agency's memorandum giving you an administrative record to demonstrate they were in  with the regulations. It limits that question to the administrative record and not any post hoc expert reports or anything else. Thank you for your time. We ask the district court to be affirmed. Thank you very much. Judge Gould, I would like to start by responding to a question you asked Mr. McFadden. You said if federal resources could sue in contribution any other party responsible for the contamination on the site, the answer would be yes. It could sue except that the government settled with the mining company for less than the total cost of cleanup and gave it contribution protection which bars federal resources from pursuing any claim to even out inappropriate allocations of who paid what here. Turning to the issue of divisibility, Mr. McFadden suggested that the only evidence supporting the fact that the harm is divisible is volumetric and that is not the case. This site has a geographic separation between the north dump and the south dump. The north dump is undisputed is exploration waste rock put there by the government. The government did not have a chance to respond to your argument. What I suggest might work is that I will give the government, if it wants it two minutes to respond to whatever you say on divisibility now, then I will give you a final minute for rebuttal, but we can't have a situation where the government has no chance to respond. Certainly. Thank you, your honor. As I was saying, there's a geographical boundary in this site. The north dump is entirely waste product, not tailings, put there by the federal resources corporation. The sampling and investigation showed that the metals content in that pile, the waste rock material in that pile was below the standards. More importantly, perhaps, it determined that the metals solubility in that dump did not allow for the movement or mobility of the metals in that material. So in other words, that material couldn't leach out into gold creek which wound through the site around the dumps. In addition, they investigated the impacts of potential water quality from the north dump by taking samples upstream in gold creek from north dump and below it. The water quality actually improved. So what we have here is data collected by the government which shows that the metals in the north dump that were waste were below clean up standards. They couldn't move. It was a stable environment. They weren't being uptake by vegetation or animals and they couldn't get into the creek to impact the sediments or the water quality or affect any animals in the water. So is your argument that there's no release? We did make that argument to the lower court. I have not made it here before this court. Instead, we're focusing on the fact that these are distinct waste piles. We have issues with the taking of the top two feet on the dump of the north dump but it is subject to a in essence it's not a co-mingled plume or a co-mingled contamination when you're looking at the north dump. You have a discrete volume of material. Granted, there are separate issues about whether it's appropriate to take all that material but you've got it. Now at the south dump, there's no dispute that the waste from exploration is less toxic, less mobile than the waste from the tailings. So what we have there is a volumetric analysis of the contributions to the waste dump. It's, if anything, the conservatism built in by treating the tailings and mine waste as the same, even though they're not and the tailings have the greater impact on the environment. I don't mean to interrupt you but you're over your time. Thank you, you've been very gracious. I'll give you some extra time. So let's ask the government, would you like to respond on divisibility? Yes, I would  respond. The Federal Resources Corporation did put waste rock at the north dumps and the south dumps on the site. Both of them were contaminated and both of them merited clean up. Daisy, why don't you add three minutes to the government's time   I'll give you some extra and then we'll let the plaintiff, the appellant rather, have another mini rebuttal. Some of the discussion just now wasn't about divisibility unless it was to support the idea that there was no release. But that is not, as Federal Resources concedes, the argument being presented to you. A lot of it goes, I guess, to whether removal at the north dump was a reasonable selection of the alternatives in the EECA. I'm not really sure what the arguments about solubility are. For example, the claim that water quality was better downstream is just false. At ER 1498 you can see the agency's conclusion that concentrations, the magnitude of many of the parameters were higher and samples collected from the stream below the mine site relative to above the mine site   The other argument that the agency found was that the metals did migrate through the stream. They tested soil and compared it to soil cleanup guidelines. They tested the effects levels, phytotoxicity guidelines, which do have to do with risks to plants and aquatic life. Those were all exceeded by 24 of the samples of the North Dump. There's nothing to support the idea that federal resources didn't release a hazardous substance. Maybe they have some dispute as to how much waste rock each party contributed. The answer is no. For the reasons I previously gave. In response to the question that Judge Gould asked about whether they could bring a contribution action, she said that the government settled earlier with another responsible party, and that you waived away their rights to go after them for contribution. I accept that as correct. I didn't know that fact. I apologize for that. The other parties in this case are potentially responsible parties. They are all related in some corporate manner or other. There are three, if I'm not mistaken, possibly four. Unfortunately, those are all in bankruptcy now, including federal resources. Those parties are all in bankruptcy. There is another mine to be distributed by the trustee. There is still potential for recovery by the United States. Between the other contributing parties, I don't know what their realistic options are. I see my time has expired. Thank you  chance to respond. Thank you. Ms. Felton, will Plutner have additional remodel? I'll just finish up briefly by saying the evidence in the record establishes there are significant disputes as to fact regarding divisibility and range reliability. With respect to divisibility, there is substantial scientific evidence about the mobility and toxicity of the substances and their location. That combined with the volumetric analysis is the theory of the most  evidence in the record. We have very detailed calculations based upon ore production by funnel and major and concentrate shift that allow for the calculations of what their waste material was. We also know the dimensions of what federal resources dug, so we know the volume of material they extracted out of the ground. That's the basis for apportionment. When the district court relies upon the government's decision here, was that the administrative record is devoid of material the government relies upon. Both the U.S. Forest Service didn't even have an administrative record. The only record was maintained by EPA. It is appropriate for the court to look beyond that. It's also appropriate when it's needed to explain scientific and technical information. The district court did look beyond the administrative record and it's appropriate for the court to do so as well. Thank you. Thank you for your arguments. Nicely presented on both sides. The case of United States versus Federal Resources Corporation shall be submitted. And we thank counsel for their
judges: Gould, Paez, Lemelle